NOLAND COMPANY, Incorporated, Defendant and Third-Party Plaintiff, Appellee and Cross-Appellant,

v.

GRAVER TANK & MANUFACTURING COMPANY, Third-Party Defendant, Appellant and Cross-Appellee.

No. 8434.

United States Court of Appeals Fourth Circuit.

Argued Nov. 6, 1961.

Decided March 19, 1962.

**44**

Joseph R. Young, Charleston, S. C.
(Hagood, Rivers & Young, Charleston, S.
C., on the brief) for appellee and cross-
appellant, Noland Company, Incorporated.

Charles H. Gibbs, Charleston, S. C.
(Sinkler, Gibbs & Simons, Charleston,
S. C., on the brief) for appellant and
cross-appellee, Graver Tank & Manufac-
turing Company.

Before SOPER, BOREMAN and
BRYAN, Circuit Judges.

BOREMAN, Circuit Judge.

Ruscon Construction Company, a South
Carolina corporation, brought this action
for damages for breach of contract
against the Noland Company, Inc., a Vir-
ginia corporation, which in turn filed a
third-party complaint against Graver
Tank & Manufacturing Company, a Dela-
ware corporation. Trial was had before
the court without a jury. It was ordered
that Ruscon was entitled to recover $13,-
065 from Noland, and Noland was award-
ed the same amount from the third-party
defendant, Graver. Both Noland and
Graver have appealed from the order of
the District Court, each challenging a
different portion thereof.

Early in 1958 the United States Gov-
ernment advertised for bids on the con-
struction cost of two Capehart Housing
projects—one at Camp Lejeune, Cherry

Point, North Carolina, and the other at the Charleston, South Carolina, Air Force Base. Included in both projects were elevated steel tanks for water storage— a 300,000 gallon tank at Cherry Point and a 500,000 gallon painted tank with cathodic protection and obstruction lights for the Charleston Air Force Base. Ruscon prepared a bid for the overall Charleston project and submitted it before the bid closing time, 2 P.M. on March 27, 1958. On the day before Ruscon submitted its bid, one Thomas, manager of the Charleston branch of the Noland Company, operating a plumbing supply business throughout the southeastern United States, learned of the water tank requirement for the Charleston contract and, at the request of one of Noland's regular customers (who was preparing a subcontract bid to submit to Ruscon), tried to obtain a price on the water tank in question. Noland's regular supplier of water tanks could not furnish the large 500,000 gallon model but suggested that Thomas contact Graver's district sales office in Atlanta, Georgia. Following this suggestion, Thomas called Graver's office on the afternoon of March 26, 1958, and talked to Best, Graver's District Sales Engineer. According to Thomas, he requested a bid price on the 500,000 gallon tank for the Charleston project. Best advised Thomas that he did not know whether his company (Graver) had prepared an estimate on that project, but that he would check with Graver's Edge Moor, Delaware, office (which prepared estimates from Government-provided specifications) and call Thomas back. About 11 A.M. on March 27, three hours before bids on the general contract were to be opened, Best called Thomas from Atlanta and told him the tank (alleged by Thomas to be

the 500,000 gallon one) could be supplied for $58,030.[1] This information was passed on by Thomas to Ruscon[2] and thirty minutes later a Mr. West from Ruscon, considering the quoted price low, called Thomas back, requesting a verification of the $58,030 price and assurance that it was based upon contract specifications. Thomas also thought that perhaps the bid was low but verified it on the information he then had and immediately placed a call for Best in Atlanta. Best was away from his office at that time and consequently there was no confirmation to Noland of the bid price prior to the deadline for submitting the general contract bid. Later in the afternoon of March 27, according to Thomas' testimony, Best was reached by telephone and confirmed the quoted price. Best testified that he could recall only two telephone conversations with Thomas on March 26–27, 1958, one on the afternoon of March 26 and the other on the morning of March 27; that in both conversations the project for which the water tank was to be used was referred to as the "Capehart Housing job"; that it was his understanding from the first telephone conversation with Thomas that the tank for the Camp Lejeune project was the subject of their discussion.

Ruscon used the $58,030 price in calculating and submitting its total bid of $527,479, the lowest one received by the Government for the Charleston project; the next lowest bid was $560,707. Other prices obtained by Ruscon for the specified 500,000 gallon water tank prior to the bid opening were $76,500 and $84,300.

As soon as Ruscon was notified that it was the low bidder and that the contract would be awarded to it, Noland was advised that its bid of $58,030 on the tank

1. Best testified that he had told Thomas the tank could be supplied to Noland for $54,000 for resale at $58,030, allowing a gross profit of $4030. It was suggested that Noland could cut the resale price if necessary to get the contract.

2. Noland's regular customer who had originally requested the bid on the tank had

learned that the water tank was not to be included in his subcontract, but Thomas was advised that someone from Ruscon would contact him about Graver's bid price. Shortly thereafter, Mr. West from Ruscon did call Thomas for a bid on the 500,000 gallon water tank.

would be accepted. On March 29, Noland received from Graver a written confirmation of its bid price but then noted that the specifications thereon were for a 300,000 gallon tank to be supplied for Camp Lejeune and did not include certain accessories required for the Charleston project. When Graver discovered the confusion, it promptly advised Noland that it could not furnish the 500,000 gallon tank for $58,030, that being the price quoted for the smaller tank. Noland, in turn, then notified Ruscon that the tank could not be furnished at the price originally quoted. Formal letters of intent to comply with the bid price were submitted by Ruscon to Noland and by Noland to Graver, but both letters were rejected and each was returned to its sender.

Ruscon performed its over-all contract with the Government, furnishing a 500,000 gallon water tank at a cost of $71,095. Thereafter the present action was brought against Noland for $13,065, the difference between the original bid price and Ruscon's actual cost of supplying the tank. Noland, in making Graver a third-party defendant, sought to recover from Graver any amount it (Noland) might have to pay Ruscon plus $4000, the amount of profit Noland allegedly would have made on the completed transaction as originally contemplated. The District Court made no determination with respect to the added claim of *profit* by Noland, and it is on this point that Noland has appealed. Graver, on the other hand, contends (1) there was no contract between Graver and Noland because of lack of mutuality but (2) if there was a contract the South Carolina Statute of Frauds [3] prevents the enforcement thereof because the contract was not in writing. Thus, there are three issues presented on this appeal: (1) Whether there is sufficient evidence in the record to sustain the District Court's determination that there was mutuality between Graver and Noland; (2) whether the District Judge properly construed and applied the South Carolina Statute of Frauds; and (3) whether, under Rule 14, Federal Rules of Civil Procedure, 28 U.S.C.A., a third-party plaintiff may recover from the third-party defendant an amount greater than that recovered by the original plaintiff from the third-party plaintiff (the original defendant).

—I—

■■ It is axiomatic that an essential element of a valid contract is mutuality between the contracting parties. Whether there was an agreement between Noland and Graver that the latter was to supply a 500,000 gallon painted water tank complete with cathodic protection and obstruction lights for $58,030 is simply a question of fact which was determined affirmatively by the District Judge as the trier of fact. Though the evidence on this point is conflicting, there is testimony which, if believed, sustains the finding of the District Court. We cannot say that such finding is clearly erroneous.

Graver argues that the undisputed facts do not support a finding of mutual understanding and a meeting of minds between Noland and Graver. Rather, it is contended, personnel from both Ruscon and Noland admitted that they considered $58,030 a suspiciously low price for a 500,000 gallon water tank with all the accessories required by the specifications for the Charleston project. From this evidence Graver would have the court conclude that it was *obvious* to both Noland's Thomas and Ruscon's West that a mistake had been made by Graver. The District Court found, however, that the bid on the tank was not sufficiently low in comparison with other bids to put Ruscon on notice that the bid price was erroneous. It is certainly reasonable to conclude that Noland had even less reason to be suspicious of the price than had Ruscon because Noland had only the one bid (from Graver), whereas Ruscon had three bids for the tank and could compare each with the others. It was shown that neither Thomas nor Ruscon personnel had

---

**3.** Code of Laws of South Carolina 1952, § 11–103.

previously dealt with a 500,000 gallon tank and did not know the general price range for tanks of that capacity. Best admitted that he knew about the Charleston project and its requirement for a 500,000 gallon tank, and that he knew Thomas' call on March 26 came from Charleston. The District Judge found that:

> "The project involved was a 'Capehart' job which is always incident to military bases and these projects during recent years have been common throughout the United States, and all persons interested in bidding a 'Capehart' job should require specific detail as to location."

It is apparent that Graver's personnel were careless in quoting for one project a price that had been determined for another project.

■ Graver discusses at some length the general principle of contract law that an offer which is based on an *obvious* mistake cannot be accepted. We find no fault with this statement of principle and there is nothing to suggest that the District Judge was not fully cognizant of it. He simply found that the mistake was not obvious to the offerees. The contract principle here pertinent is that a unilateral mistake does not render the transaction voidable by the party making the mistake (absent other considerations not applicable here). Restatement of Contracts § 503 (see illustration 1 in particular) (1932); 12 Am.Jur. Contracts § 133 (1938). Also pertinent is the basic premise of contract law that an offer is judged by its objective manifestations, not by any mental reservations or subjective interpretations or intentions of the offeror. See Bach v. Friden Calculating Mach Co., 155 F.2d 361, 365 (6th Cir. 1946); 12 Am.Jur. Contracts § 19 (1938). We have found no South Carolina cases expressing these almost universally accepted principles, but neither is there intimation that South Carolina would not follow them.[4] Thus, Graver cannot void its contract with Noland because of its own mistake as to size and project site of the tank.

## —II—

■ Graver's second line of defense was that the South Carolina Statute of Frauds[5] prevents enforcement of the oral contract (assuming that there was mutuality) between Noland and Graver. It is undisputed that there is no written memorandum whereby Graver agreed to supply a 500,000 gallon tank for $58,030; that Graver failed to deliver the tank or any part thereof; that the item involved was valued in excess of $50. Thus, there has been no compliance with the Statute of Frauds but Noland contends, and the District Judge found, that the Statute of Frauds had no application to this case because the water tank in question was not *in solido* at the time the contract for its purchase was made. The trial judge found as fact that labor in connection with the assembly of the tank and its erection at the project site was an essential element of consideration by the terms of the contract. Graver contends on appeal that the latter finding is not supported by record evidence and that the court below erred in applying the South Carolina interpretation of that state's Statute of Frauds.

The finding in question is not only supported by the record evidence but,,

---

4. No issue has been made here as to what state law governs this transaction but it is assumed that since Noland's acceptance of Graver's bid (letter of intent) was mailed from South Carolina, the law of that state would govern. It is well established that the governing law is that of the state where the last act leading to a binding contract occurs.

5. "§ 11–103. Contracts for sale of goods for fifty dollars or more.

"No contract for the sale of any goods, wares and merchandise for the price of fifty dollars or upwards shall be allowed to be good unless (a) the buyer shall accept part of the goods so sold and actually received the same or give something in earnest to bind the bargain or in part payment or (b) some note or memorandum in writing of the bargain be made and signed by the parties to be charged by such contract or their agents thereunto lawfully authorized."

indeed, may be said to be required by the testimony of the agents for the contracting parties. This point is virtually conceded, though perhaps unwittingly, by the third-party defendant (Graver) in its brief, where it is stated:

> "* * * *What the parties contemplated was a completed elevated water tank, and no one gave any consideration, during the very brief period of negotiations, to the kind and amount of work and labor necessary nor to the amount of expense to be incurred in erecting the tank. The component parts of the tank were for the most part in existence at the time the contract was made and there only remained to be done the relatively small dollar percentage of work and labor in assembling and erecting the tank.* This work and labor amounted only to ten or fifteen per cent of the purchase price of the tank." (Emphasis added.)

The fact that the cost of assembling and erecting the water tank was a relatively small part of its total cost does not make the assembly and erection nonessential elements of the contract's terms. It is abundantly clear from the evidence that Graver did not keep assembled 500,-000 gallon water tanks in stock; that all the parties contemplated the purchase of a completely assembled and painted water tank with cathodic protection and obstruction lights; and that the tank was to be "tailor-made" (according to Best's own testimony) for the purchaser at the project site. The value of labor in a product in relation to its total cost may be evidence of the essentiality or nonessentiality of the labor to the contract, but such relationship is not necessarily a controlling fact. However, even if we were to assume that the relationship between value of labor and value of materials is controlling, we could not say that labor, constituting ten to fifteen per cent of the value of a finished product, was a nonessential element of that product. We conclude that the judge's finding that the tank was to be created or manufactured after an order therefor had been received is amply supported by the record. The next question is whether there was error in the application of South Carolina's Statute of Frauds.

Graver has helpfully provided a compilation of South Carolina Supreme Court decisions dealing with that state's Statute of Frauds.[6] We have considered the references to those decisions but both parties to this appeal agree that Wallace v. Dowling, 86 S.C. 307, 68 S.E. 571 (1910), contains a correct statement of South Carolina's interpretation of the Statute of Frauds. There it is stated, 68 S.E. at 572–573:

> "* * * * But if the contract is for the sale of goods in futuro, which are not in existence at the time, and for work and labor to be bestowed upon them by the vendor, or procured at his expense, so as to make work and labor the essential consideration of the contract, it is not within the statute of frauds. Also, by the case of Gadsden v. Lance, McMul. Eq. 87, 37 Am.Dec. 548, in which it is said that 'it is now the settled rule that when the goods contracted for exist in solido, and are capable of delivery at the time, it is within the statute; but where they are to be made, or something is to be done, to put them in a condition to be delivered, according to the terms of the contract, it is not within the statute.' "

It is said that this interpretation represents a minority view,[7] but nevertheless it is the South Carolina view which must govern in this case.[8] In our opinion, the

6.  Gadsden v. Lance, 16 S.C.Eq. (McMullan) 87 (1841); Bird v. Muhlinbrink, 1 Rich.Law 199 (1845); Winship & Co. v. Buzzard, 9 Rich.Law 103 (1855); Barbour v. Disher, 11 Rich.Law 347 (1858); Suber v. Pullin, 1 S.C. 273 (1869); Wallace v. Dowling, 86 S.C. 307, 68 S.E. 571 (1910); Fine v. Hall & Co., 216 S.C. 564, 59 S.E.2d 161 (1950).

7.  49 Am.Jur. Statute of Frauds § 252 (1943).

8.  See note 4, supra.

application of this rule by the District Judge to the facts of the instant case was correct.

—III—

We now consider Noland's sole ground for appeal. It is contended that the District Court should have awarded Noland an additional $4000 against Graver because of the loss of that amount of anticipated profit.[9] The basic question (ignored by Noland in its opening brief and merely mentioned without supporting discussion or citation of authority in its reply brief) is whether under Rule 14, Federal Rules of Civil Procedure, a third-party plaintiff can recover from a third-party defendant a sum greater than that sued for by the original plaintiff. The District Court's opinion and order are likewise silent on this issue.

Under Rule 14, a defendant may file a third-party complaint against any "person not a party to the action *who is or may be liable to him for all or part of the plaintiff's claim against him.*" (Emphasis added.) Graver contends that the rule thus imposes a maximum limit on the amount which a third-party plaintiff may recover from a third-party defendant, i. e., the amount recovered by the original plaintiff from the original defendant (third-party plaintiff). Relied upon in support of this construction of the rule are the following District Court cases, two of which present situations allegedly analogous to the one at bar and one of which appears to be squarely in point: Geborek v. Briggs Transportation Co., 139 F.Supp. 7 (N.D.Ill.1956); United States v. Scott, 18 F.R.D. 324 (S.D.N.Y. 1955); and Liberty Mut. Ins. Co. v. Vallendingham, 94 F.Supp. 17 (D.D.C.1950). We are also referred to 3 Moore, Federal Practice, § 14.07 (2d ed. 1948).

Geborek and Vallendingham, supra, deal with the question of whether the party against whom a third-party complaint was filed was properly in the case,

the answer to the question depending upon whether there was any legal basis for liability on the part of the third-party defendant to third-party plaintiff for the *claim* of plaintiff against third-party plaintiff. United States v. Scott, supra, involves a motion by a third-party defendant to dismiss the third-party complaint which alleged that third-party defendant was liable to third-party plaintiff for the amount of any recovery by the original plaintiff from defendant, plus $3000 damages. There the District Judge dismissed only that portion of the complaint which asserted the $3000 damage claim and refused to dismiss the remainder of the complaint. That case, though factually apposite, is, of course, not controlling and we do not find the reasoning of the opinion persuasive in determining the question here. We have not found nor have we been referred to controlling authority in point.

We are not here concerned with determining whether the third-party defendant could properly be brought into this action. It is important to bear in mind that the precise issue here is whether, under Rule 14, a third-party defendant, *once made a party to an action*, can be proceeded against by the third-party plaintiff upon a claim closely related to, yet different from and for an amount in excess of, the original plaintiff's claim asserted in the primary action. The basic considerations involved in a determination of each of these two issues are quite separate and distinct.

Here the original defendant, third-party plaintiff, asserts against the third-party defendant not only a right to be indemnified to the extent of plaintiff's recovery but also the additional right to recover alleged loss of anticipated profit of $4000. It is conceded by Graver that the profit issue is not, in any way, complicated; that a determination thereof would not have been unduly burdensome to any party litigant; that the litigation

---

9. Noland relies upon Jenkins v. Charleston St. Ry. Co., 58 S.C. 373, 36 S.E. 703 (1900), and National Tire & Rubber Co. v. Hoover, 128 S.C. 344, 122 S.E. 858 (1924), for the general principle of contract law that the loss of anticipated profits is a proper element of damage in a suit for breach of contract.

would not have been appreciably prolonged by such determination. It is readily apparent that the facts supporting Noland's ancillary claim for loss of anticipated profit are substantially the same as those developed in the trial of the primary questions—whether Noland breached a contract with Ruscon and whether that breach was in turn caused by Graver's breach of its contract with Noland.

Situations might arise where independent claims between a third-party plaintiff and a third-party defendant, even though growing out of the same transactions involved in the original action and the claim of right to indemnification, could not be litigated expeditiously and without serious or seemingly endless complications. However, through usual and approved pre-trial procedures, the District Court could ascertain and foresee with relative ease and minimum effort any such complications.

The District Court made no finding and reached no conclusion concerning the $4000 claim. So far as disclosed by the record, the issue was simply ignored. From this we might infer that (1) the District Court was of the opinion that it lacked jurisdiction, or (2) that the third-party plaintiff's $4000 claim was without merit. One of the primary objectives of third-party procedure is to avoid circuity and multiplicity of actions. In view of the ease with which disposition of all claims herein could be made in this one action, we conclude that Rule 14 should be construed to be sufficiently broad and flexible so as to permit the District Court, in the exercise of its sound discretion, to make such disposition.

There is an abundance of dicta in the opinions of this court and our sister courts supporting the result we reach in this case. Perhaps today's decision was foreshadowed by Duke v. Reconstruction Finance Corp., 209 F.2d 204, 208 (4th Cir.), cert. denied, 347 U.S. 966, 74 S.Ct. 777, 98 L.Ed. 1108 (1954), in which Judge Dobie, writing for this court, indicated that the District Judge had the power to vacate an earlier order of impleader under Rule 14 but such action was not necessarily required even though the District Court found that the issue between defendant and impleaded parties was "a separate and distinct controversy." Judge Dobie reasoned that the various claims involved in that litigation had a common source and it would have been more economical and expeditious to adjudicate them in a single action. However, because of the complicated nature of that case and the fact that the third-party plaintiff was not seriously prejudiced by the District Court's refusal to permit impleader, this court affirmed the vacating order thus recognizing the power of the District Court to exercise its discretion in such circumstances. For other instances in which we have had occasion to liberally construe Rule 14 and to discuss its purpose, see American Export Lines, Inc. v. Revel, 262 F.2d 122 (4th Cir. 1958), and Glens Falls Indem. Co. v. Atlantic Bldg. Corp., 199 F.2d 60 (4th Cir. 1952).[10]

While affirming the judgment in favor of Noland against Graver, we are remanding the case for consideration of Noland's additional claim, being of the opinion, as we are, that disposition thereof should be made by the District Court. It is noted that both parties have used the figure $4000 in discussing, before

10. Other cases discussing the purpose of Rule 14 and indicating a trend toward a broad and liberal interpretation of the Rule are here noted. However, the fact that we cite them is not to be construed as an intimation by us that they are factually apposite to the case at bar—they are not. See Southern Milling Co. v. United States, 270 F.2d 80 (5th Cir. 1959); Dery v. Wyer, 265 F.2d 804 (2d Cir. 1959); St. Paul Fire & Marine Ins. Co. v. United States Lines Co., 258 F.2d 374 (2d Cir. 1958), cert. denied, 359 U.S. 910, 79 S.Ct. 587, 3 L.Ed.2d 574 (1959); Henry Fuel Co. v. Whitebread, 99 U.S. App.D.C. 9, 236 F.2d 742 (1956); American Fidelity & Cas. Co. v. Greyhound Corp., 232 F.2d 89 (5th Cir. 1956); and Blair v. Cleveland Twist Drill Co., 197 F.2d 842 (7th Cir. 1952).

this court, the amount of Noland's lost profit. Of course, the proper element of damage is Noland's loss of *net profit*, rather than gross profit. If the amount of damages is disputed, the District Court may require further evidence on this point before entering final judgment.

Affirmed in part and remanded for further proceedings.