The JOHNS HOPKINS UNIVERSITY,
Plaintiff,

v.

James M. HUTTON, Jr., et al., Defendants.

Civ. No. 15098.

United States District Court
D. Maryland.

May 2, 1966.

Supplemental Opinion May 17, 1966.

John Henry Lewin, Edmund P. Dandridge, Jr., and Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

John A. Wilson, Michael J. DeSantis and Shearman & Sterling, New York City (William L. Marbury, Decatur H. Miller and Piper & Marbury, Baltimore, Md., on brief), for defendants.

Benjamin C. Howard, Baltimore, Md., William R. Glendon, Royall, Koegel & Rogers, and Bardusch, Johnson, Schem-

inger & Duncan, New York City, for Naess & Thomas.

THOMSEN, Chief Judge.

This is an action for damages brought by the Johns Hopkins University (Hopkins) against James M. Hutton, Jr., et al., co-partners, doing business as W. E. Hutton & Co. (Hutton). It arises out of the purchase by Hopkins of an oil production payment from Trice Production Co. (Trice), in connection with which Hutton received a commission from Trice. Hopkins claims that Hutton violated certain sections of the Securities Act of 1933, of the Securities Exchange Act of 1934, and of rules adopted thereunder, and is chargeable with common law fraud and negligence. Hutton has filed a belated motion for leave to bring in as third party defendant Hopkins' investment counsel, Ragnar D. Naess, et al., co-partners doing business as Naess & Thomas (Naess), for contribution as joint tortfeasors, charging Naess with violations of the same statutes and rules, and with breach of trust, negligence, common law fraud and violation of the Investment Advisers Act of 1940. Hutton's motion is opposed by Hopkins and by Naess for several reasons, including: laches; lack of jurisdiction; lack of legal basis for the claimed right of contribution; lack of factual basis for the claimed right of contribution; and that the proposed third party complaint would create serious confusion of issues, unreasonable delay to Hopkins, and unreasonable expense to both Hopkins and Naess.

*Laches*

The original complaint was filed on November 1, 1963. Hutton's answer was filed on February 3, 1964. Hutton has taken the depositions of ten witnesses, a total of 4,554 pages, and has filed many interrogatories, requests for admissions and other papers seeking discovery. Hopkins has filed hundreds of interrogatories and requests for admissions, has taken the depositions of six witnesses, a total of 694 pages, and is about to take the depositions of various witnesses for use at the trial. Over 1,000 documents have been produced and identified. Each side has objected to much of the discovery sought by the other, as a result of which long hearings have been held before a master and ten days of hearings have been held in open court, in addition to many conferences in chambers. Counsel for Hopkins and counsel for Hutton charge each other with unreasonable delays, both with some cause. Hopkins' amended complaint was served on October 29, 1965, Hutton's answer thereto on December 8, 1965. Hutton's motion for leave to file a third party complaint was filed on February 16, 1966. Before and after the hearing thereon, Hutton has filed or mailed to the Court five memoranda, Hopkins three, and Naess, appearing specially, two. The deposition of Ragnar D. Naess was commenced on October 6, 1964, was suspended on February 19, 1965, and has not yet been completed. The deposition of Walton F. Canedy was commenced on April 21, 1965, and was completed on September 29, 1965.

Hutton claims that it was unable to file its third party complaint sooner principally because it was not aware of all the facts until recently. At the hearing on the motion the Court asked Hutton's counsel three times what facts he had recently learned, and three times Hutton's counsel failed or refused to answer the question. His subsequent memoranda are equally uninforming. The Court is satisfied that in the autumn of 1964 Hutton knew substantially all facts upon which it now relies.

Hutton also suggests that the recent filing of an amended complaint justifies its belated motion. The amended complaint increased the ad damnum for "actual" damages from $1,000,000 to $1,-500,000, and added a claim of $1,500,000 for punitive damages; otherwise it added little of substance to the original com-

plaint. Hutton has not pointed out any new matter therein which bears upon the subject matter of the proposed third party complaint.

■ Laches in moving to file a third party complaint has frequently been held to be grounds for refusal of the motion.[1] Unreasonable delay, however, is not necessarily fatal to such an effort; the other contentions raised by Hutton (avoidance of circuity of action and duplication of work by court, counsel, parties and witnesses) and by Hopkins and Naess (confusion of issues, delay and additional work and expenses herein) should be thrown into the balance. Those contentions require a comparison of the allegations and claims in the amended complaint with those in the proposed third party complaint.

### The Amended Complaint

In each of the seven counts in its amended complaint Hopkins makes the following allegations:

In 1960, Hutton was employed by Trice to act as its adviser, broker and agent in the sale of production payments carved out of certain oil and gas properties owned by Trice. Hutton offered for sale and sold three such production payments, including the one offered for sale and sold to Hopkins, and Trice paid Hutton commissions amounting to 2% of the sales price obtained.

Pursuant to that arrangement, Hutton and Trice offered to sell to Hopkins a production payment out of certain oil and gas properties of Trice located in Texas, Oklahoma and Louisiana, described in a brochure prepared by Hutton and Trice and delivered by them to the Treasurer of Hopkins. The brochure stated that Trice desired to sell produc-

tion payments in the amount of $2,700,-000; that a commitment for approximately $1,400,000 had been received from a bank as a separate first production payment from certain properties; that a second production payment of approximately $1,300,000 from the same properties and from five additional properties (which would be subordinate to the bank's production payment except as to the five additional properties) would also provide for certain net profits interests; and that, based on stated estimates of the value and rate of realization of the oil and gas reserves in the properties subject to the second production payment, the purchaser thereof would realize a substantial sum in excess of its cost.

Hutton represented to Hopkins, as a further material inducement to purchase the production payment, that the estimates of future net revenues and rate of realization from the oil and gas reserves set forth in the brochure were the estimates of independent engineers who had studied each of the properties.

Hutton also recommended to Hopkins and to Naess, Hopkins' financial adviser, that they select Chester L. Brown, Vice-president of Petroleum Consultants, Inc., to make a study of the reserves and a check of said estimates on behalf of Hopkins, at Trice's expense. In making this recommendation Hutton did not reveal that the employee of Hutton who was dealing with Hopkins had been for many years an intimate friend and associate of Brown, had recently encouraged him to form his consulting engineering company and had indicated to Brown that Hutton would employ him in connection with this production payment. In early 1961, without the knowledge of Hopkins, Hutton employed

1. Graeff v. Borough of Rockledge, E.D. Pa., 35 F.R.D. 178 (1964); Dyke v. Sechrist, D.Md., Chesnut, J., 21 F.R.D. 240 (1957); Casey v. Calmar Steamship Corp., D.Del., 138 F.Supp. 751 (1956); United States v. Shuman, N.D.W.Va., 1 F.R.D. 251 (1940); Merritt-Chapman & Scott Corporation v. Frazier, 9 Cir., 289 F.2d 849 (1961); King v. Edward B. Marks Music Corp., S.D.N.Y., 56 F.Supp. 446 (1944); Bernstein v. N. V. Nederlandsch-Amerikaansche Stoomvaart-Maatschappij, S.D.N.Y., 6 F.R.D. 297 (1946).

Brown, at the joint·expense of Hutton and Trice, to make a study and estimate of said reserves not for Hopkins but for Hutton and Trice; instructed Brown to make a report which would omit details; concealed from Brown that Hopkins had been led by Hutton to believe that Brown was an independent engineer acting for Hopkins; concealed from Brown the existence of the reports and estimates that had been made by independent engineers for Trice concerning which Hutton had made representations to Hopkins; and failed to request Brown to make any check of such reports or estimates.

While Brown was making his study and estimates for Hutton and Trice, Hutton represented to Hopkins that Brown was making the study and estimate as Hopkins' "independent reservoir engineer", and, acting as such, was checking the earlier reports and estimates of said reserves made by the independent engineers. Hutton represented to Hopkins that Brown's study and estimates showed that the figures previously represented by Hutton were conservative and that Hopkins could expect repayment of its investment with interest in a shorter time and could expect a greater return from its net profits interest than had been estimated by the original independent engineers. Hutton forwarded to Hopkins Brown's report, which confirmed those representations.

Relying to a material degree on each of said material representations made by Hutton, Hopkins purchased for $1,300,000 the production payment and net profits interests on March 1, 1961.

On October 15, 1962, Trice filed in the United States District Court for the Eastern District of Texas, Tyler Division, a Petition for Reorganization under Chapter X of the Bankruptcy Act. In early 1963, Hopkins received a report disclosing that the reserves of oil and gas in the properties included in the $1,300,000 production payment purchased by Hopkins were substantially less than as represented by Hutton. Also in 1963, within one year prior to the filing of the original complaint herein, Hopkins learned for the first time that the alleged representations made by Hutton were false, and learned for the first time of the alleged skulduggery in connection with Brown's report.

The amended complaint then makes the following allegations and claims the following relief in seven separate counts:

*First Count.* As a result of the acts and omissions described above, Hutton is liable to Hopkins under section 77*l*(2) of Title 15, U.S.C.A. (section 12(2) of the Securities Act of 1933) for $1,300,000 (the consideration paid by Hopkins for the security), with interest, costs and certain fees and expenses, less the income received thereon by Hopkins, in return for the security, which Hopkins has tendered to Hutton.

*Second Count.* Hutton acted as broker and dealer in the transaction described, and violated section 78j(b) of Title 15, U.S.C.A. (section 10(b) of the Securities Exchange Act of 1934) and Rule X–10B–3 of the Securities and Exchange Commission; Hopkins, therefore, should recover $1,500,000 damages, plus costs and certain fees and expenses.

*Third Count.* Hutton's actions violated section 78j(b) of Title 15, U.S.C.A. (section 10(b) of the Securities Exchange Act of 1934) and Rule X–10B–5 of the Securities and Exchange Commission; Hopkins, therefore, should recover $1,500,000 damages, plus costs and certain fees and expenses.

*Fourth Count.* Hutton acted as broker and dealer in the transaction, and violated section 78*o*(c) (1) of Title 15, U.S.C.A. (section 15(c) (1) of the Securities Exchange Act of 1934); Hopkins, therefore, should recover $1,500,000 damages, plus costs and certain fees and expenses.

*Fifth Count.* Hutton's actions violated section 77q of Title 15, U.S.C.A. (section 17(a) of the Securities Act of 1933);

Hopkins, therefore, should recover $1,-500,000 damages, plus costs and certain fees and expenses.

*Sixth Count.* Hutton's false representations and fraudulent conduct were known by Hutton to be false and were designed to deceive and induce Hopkins to purchase the production payment; Hopkins relied to a material degree upon said false representations, and was entitled to rely thereon; Hopkins, therefore, should recover $1,500,000 for alleged actual damages and an additional $1,500,000 as punitive and exemplary damages, plus costs and certain fees and expenses.

*Seventh Count.* Hutton's false representations were made negligently and with reckless indifference as to their truth; Hopkins, in the exercise of due care, relied to a material degree upon said false representations, and was entitled to rely thereon; Hopkins, therefore, should recover $1,500,000 damages, plus costs and certain fees and expenses.

### The Proposed Third Party Complaint

The third party complaint which Hutton seeks leave to file against Naess contains eight counts. The first 13 paragraphs are included in all counts. After preliminary allegations and a brief summary of the amended complaint, paragraphs 11 to 13 allege in substance: The damages claimed by Hopkins were not caused by Hutton but were caused by the actions and conduct of Naess and of persons other than Hutton, which are set forth in detail in paragraph 11, and may be summarized as follows:

Ragnar Naess and his firm had been investment counsel for Hopkins for over 20 years under an annual retainer; Canedy, the Baltimore partner of Naess, attended all meetings of the Hopkins Finance Committee. Ragnar Naess was a friend and acquaintance of the president of Trice and he and his clients had made personal investments in Trice's oil drilling ventures.

On August 30, 1960, Trice suggested to Naess that Naess recommend Trice production payments to Naess' institutional clients, and offered Naess a 2% finder's fee on any money so invested. Trice enclosed with his letter of August 30 a brochure dated August 8, 1960.[2]

About September 16, 1960, Trice sent Naess another brochure[3] and suggested to Naess that the production payment described therein might be of interest to Hopkins. Naess explained it to Hopkins' Treasurer, adding that Trice was a good company and that Cliff W. Trice was honest and had "integrity".

On September 21, representatives of Trice, Naess and Hutton visited Hopkins and Trice presented a proposal by Trice to sell a production payment to Hopkins in the approximate amount of $1,300,000, representing a secondary interest in the $2,700,000 production payment referred to in the September 16 brochure. The Hopkins' Finance Committee discussed the proposal on October 14, and suggested that Hopkins might wish to employ its own oil consultant.

On or about October 14, Bankers Trust Company of New York, through its nominee, Oilco, Inc., purchased from Trice a $1,375,000 production payment, representing a senior interest in the

2. Hutton does not allege that Naess accepted this proposition and it is conceded that Hutton received the 2% commission in connection with the sale of the production payment which was sold to Hopkins. The August 8 brochure described a proposed production payment in the aggregate amount of $2,700,000, and stated that the estimated future net revenue to be realized from the oil and gas properties in the production payment described in that brochure was $5,083,773.

3. Hutton alleges that this brochure was prepared by Trice and referred to the same production payment. The September 16 brochure stated the estimated revenue from the production payment described therein to be $6,560,000.

production payment which had been offered to Hopkins.[4]

About that time, Meeks, a friend of Ragnar Naess, and Chester W. Brown formed Petroleum Consultants, Inc. Naess investigated Meeks and Brown and "selected" Brown as Hopkins' independent oil consultant to check the oil and gas reserves. On December 23 Hopkins' Treasurer reported to the Finance Committee that Trice was prepared to pay the cost of Hopkins "sending its own consultant to check on the particular wells" in the oil and gas properties if Hopkins was interested.

On February 1, 1961, Hopkins' legal counsel made a written analysis of the proposed purchase, which indicated, among other things: the speculative nature of the production payment, the risks involved, and the necessity of Hopkins to rely on the integrity and skill of Trice, the operator of the oil and gas properties. Counsel advised the Treasurer to obtain three engineering reports with respect to the Trice production payment, namely, the reports of DeGolyer & MacNaughton, of Schafer Engineering Company, and of Brown, before the purchase of the production payment was consummated.

On February 7 Trice delivered a new brochure, prepared by himself, which set forth the estimated future net revenues to be realized from the oil and gas properties in the production payment proposal, said to be based not only on evaluations of DeGolyer & MacNaughton and of Schafer Engineering Company but also on evaluations made by the engineering staff of Mercantile National Bank of Dallas. Neither Naess nor Hopkins obtained any of those evaluations prior to the purchase of the $1,300,000 production payment by Hopkins.[5] Brown made an independent evaluation of the properties involved in the Trice production payment and set forth his opinion in a report which was delivered to Hopkins.

Naess advised Hopkins: that he had read the Brown report; that he had communicated with Bankers Trust, which had previously purchased from Trice the $1,375,000 production payment senior to the one proposed for purchase by Hopkins; and that he had checked the standing of Trice and its president with the Mercantile National Bank at Dallas. In a letter dated February 14, which was read at a Finance Committee meeting on February 24, Naess recommended that Hopkins purchase the Trice production payment in the amount of $1,300,000. In authorizing and approving the purchase, which was consummated on March 1, 1961, in Texas, the Finance Committee relied on the representations and recommendations of Naess.[6]

4. Bankers Trust had a primary interest in the oil and gas and the proceeds therefrom in approximately 18 wells of the 23 wells in the oil and gas properties in the production payment in the approximate amount of $1,300,000. Hopkins was to have an interest subordinate and secondary to Bankers Trust in those 18 wells and a primary interest in only 5 wells.

5. On February 10, the Treasurer reported to the Finance Committee:
   "That Chester L. Brown 'was selected by the University's investment counsel to make a report'; and
   "That 'it is planned to have Mr. Naess, who introduced Trice Production Company to the University, make further investigations with the Bankers Trust Company, which is lending $1,-

375,000 to Trice, and study the report by Mr. Chester Brown and then make recommendations to the University'."

6. Hutton also moved concurrently to amend its proposed third-party complaint, in the event that complaint should be allowed, to allege in substance: That as an essential part and "in consideration of" Hopkins' purchase of the production payment, Trice Production Company gave Hopkins a letter of guarantee dated February 23, 1961, to be effective until the Oilco production payment was liquidated; and That in this letter Trice guaranteed that the amounts to be received by Hopkins would be sufficient to pay Hopkins 6% per annum on the "unpaid balance of the primary sum of $1,300,000"; and that if in any month the proceeds from the oil and gas extracted from the wells did not amount

From August 1960 to March 1, 1961, and thereafter, Naess was aware: that Trice's financial condition was not satisfactory; that it had a serious deficiency in working capital;[7] that it had no cash "to speak of"; and that Trice urgently needed working capital in order to extract oil and gas from the ground, and sell the oil and gas to generate the revenue to meet the payments due Bankers Trust and Hopkins, which was essential if Hopkins was to be paid the $1,300,000 with 6% interest plus the "kicker" of 90% of the original money advanced provided for under its production payment.

Paragraph 12 alleges that Naess failed to disclose to Hopkins at or before the time when Hopkins purchased the production payment that Trice had offered Naess a 2% finder's fee in connection with Trice production payments; that Trice's financial condition was not satisfactory; that it had a serious deficiency in working capital and urgently needed cash; that Naess and its clients had previously made personal investments in Trice oil drilling ventures; that the Trice brochure of August 8, 1960, stated the estimated future net revenue to be realized from the oil and gas properties in the $2,700,000 Trice production payment was $5,083,773, whereas the Trice brochure of September 16, 1960, set forth the estimated future net revenue

from the same oil and gas properties as $6,560,000, and that on or about September 14, 1960, Naess represented to Hopkins that the estimated future net revenue to be realized from the oil and gas properties in the Trice production payment was $6,560,000.

Paragraph 13 alleges that in purchasing the production payment for $1,300,000 on March 1, 1961, Hopkins did not rely on Hutton, but did rely: upon the research, advice, opinions, statements, representations, actions and conduct of Naess; upon Naess' introduction of Trice to Hopkins and upon Naess' assurance of the honesty and integrity of Trice; upon Brown and Petroleum Consultants, Hopkins' oil and gas consultant, selected by Naess; upon Trice; upon Hopkins' general counsel; and upon Hopkins' special Texas counsel.

Additional allegations and claims are made in eight separate counts, as follows:

*First Count.* "14. In the event that defendants should be held liable to Hopkins under Section 77*l*(2) of Title 15 U.S.C.A. (Section 12(2) of the Securities Act of 1933) referred to in the First Count of Hopkins' amended complaint, then the advice, opinions, statements, representations, omission to state material facts, actions and conduct of Naess & Thomas, their agents, representatives and employees,

---

to 6% Trice would pay, out of its own funds, the amount necessary to increase the amount to be received by Hopkins to 6% per annum on the unpaid balance of the primary sum; and That the solvency of Trice Production Company and its financial ability to operate the oil and gas properties was, at all times, a matter of paramount importance to Hopkins.

The proposed third party complaint also alleges certain subsequent events in which Hutton did not participate, including the following: At a meeting of the Finance Committee on February 9, 1962, Trice's extreme need for cash and "its current position in the red" were discussed and recognized. On February 13, 1962, the Treasurer of Hopkins advised Naess that Trice was $18,000,000 "under water"

and they discussed Trice's "serious financial condition". Naess recommended that Hopkins "go ahead with the additional $1,000,000" purchase of a second oil and gas production payment from Trice. Hopkins again relied upon the representations and recommendation of Naess and purchased the second production payment on February 14, 1962. Neither Hutton nor any of its partners or employees participated in any way in the purchase by Hopkins of the second production payment.

7. It is alleged that as of December 31, 1960, Trice had current liabilities of $16,097,617 and current assets of only $2,127,703.

as set forth in paragraphs 11 through 13 above constitute: a violation of Section 77l(2) of Title 15 U.S.C.A. (Section 12(2) of the Securities Act of 1933); or a breach of the relationship of trust and confidence which had existed between Naess & Thomas and Hopkins for over 20 years; or both.

"15. Under the circumstances set forth in paragraphs 1 through 14 above, if the defendants should be held liable to Hopkins, third-party plaintiffs are entitled to contribution from the third-party defendants: Ragnar D. Naess, David Rosenberg, Ramsay Wilson, Walton F. Canedy, Timothy J. Sullivan and Victor S. Berni, co-partners doing business as Naess & Thomas; Naess & Thomas, a partnership, New York, New York; and Naess & Thomas, a partnership, Baltimore, Maryland."

*Second Count.* Paragraph 16 adopts the allegations of Paragraphs 1 to 13 of the First Count. Paragraph 17 reads exactly like Paragraph 14 of the First Count, except that "Section 78j(b) of Title 15 U.S.C.A. (Section 10(b) of the Securities Exchange Act of 1934) and Rule X–10B–3 of the Securities and Exchange Commission, referred to in the Second Count of Hopkins' amended complaint", are substituted for "Section 77l (2) of Title 15 U.S.C.A. (Section 12(2) of the Securities Act of 1933)" in the two places where those words appear in Paragraph 14 of the First Count. Paragraph 18 is identical with Paragraph 15, except that the reference is to "the circumstances set forth in Paragraphs 16 and 17".

*Third Count.* The Third Count is similar to the Second Count, except that the statute and rule cited are Section 78j(b) of Title 15 U.S.C.A. (Section 10(b) of the Securities Exchange Act of 1934) and Rule X–10B–5 of the Securities and Exchange Commission, referred to in the Third Count of Hopkins' amended complaint.

*Fourth Count.* This Count is similar to the Second Count, except that the statute cited is Section 78o (c) (1) of Title 15 U.S.C.A. (Section 15(c) (1) of the Securities Exchange Act of 1934), referred to in the Fourth Count of Hopkins' amended complaint.

*Fifth Count.* This Count is similar to the Second Count, except that the statute cited is Section 77q of Title 15 U.S.C.A. (Section 17(a) of the Securities Act of 1933), referred to in the Fifth Count of Hopkins' amended complaint.

*Sixth Count.* Paragraph 28 adopts the allegations of Paragraphs 1 to 13 of the First Count. Paragraph 29 alleges that the omission by Naess to disclose material facts, unknown to Hopkins, as set forth in Paragraphs 11 through 13, was designed to deceive Hopkins and to induce Hopkins to purchase the production payment. Paragraphs 30 and 31 allege that Hopkins relied upon the advice, opinions, statements and representations of Naess, which were made negligently and with reckless indifference as to their truth; that Hopkins was entitled to rely thereon because said advice, opinions, statements and representations were made in response to inquiries by Hopkins, both direct and indirect, and, also, because of the relationship of trust and confidence reposed in Naess by Hopkins; and that, by reason of the foregoing, Naess, "in addition", breached the relationship of trust and confidence which had existed between Naess and Hopkins for over 20 years. Paragraph 32 alleges:

"In the event that defendants should be held liable to Hopkins under any one of the seven counts of the amended complaint, then by reason of the matters set forth in paragraphs 28 through 31 above, the third party plaintiffs [Hutton] are entitled to contribution from third party defendants [Naess]."

*Seventh Count.* This Count is like the Sixth Count, except that the allegations

of Paragraph 29 are omitted from the Seventh Count.

*Eighth Count.* Paragraph 38 adopts the allegations of Paragraph 1 to 13 of the First Count. Paragraph 39 alleges:

"In the event that defendants should be held liable to Hopkins under any one of the seven counts of the amended complaint, then Naess & Thomas, their agents, representatives and employees, by use of a means or instrumentality of interstate commerce, directly or indirectly, by their advice, opinions, statements, representations, omission to state material facts, actions and conduct as set forth in paragraphs 11 through 13 above, have employed a device, scheme or artifice to defraud or have engaged in transactions, practices or a course of business which operated as a fraud or deceit upon Hopkins which constitute: a violation of Section 80b-6 of Title 15 U.S.C.A. (Section 206 of the Investment Advisers Act of 1940); or a breach of the relationship of trust and confidence which had existed between Naess and Thomas and Hopkins for over 20 years, or both."

Paragraph 40 is like the last paragraph of all the other Counts.

*Avoidance of Circuity of Action and Duplication of Work*

*vs.*

*Confusion of Issues, Delay and Additional Work Herein*

One of the primary objectives of third party procedure under Rule 14, F.R.Civ.P., is to avoid circuity and multiplicity of actions and needless and expensive duplication of work. Noland Company v. Graver Tank and Manufacturing Company, 4 Cir., 301 F.2d 43, 50 (1962); Dery v. Wyer, 2 Cir., 265 F.2d 804 (1959). However, "[t]he question whether third party defendants may be brought in on motion is ordinarily a matter resting within the sound discretion of the trial judge." Baltimore & O. R. Co. v. Saunders, 4 Cir., 159 F.2d 481, 483 (1947). The Court "must balance the desire to avoid circuity of action and to obtain consistent results against any prejudice which the plaintiff might suffer from complication of the case, as well as considering whether there is any merit to the third party claims." 1A Barron & Holtzoff, Federal Practice and Procedure, Rules Ed., by Charles A. Wright, § 423, p. 648. See also Lee's, Inc. v. Transcontinental Underwriters, D.Md. (Chestnut, J.), 9 F.R.D. 470 (1949); Merritt-Chapman & Scott Corp. v. Frazier, 9 Cir., 289 F.2d 849 (1961); 3 Moore's Federal Practice, 2d ed., paras. 14.05, 14.11.

Hutton argues that there would be no prejudice to Hopkins because the facts which tend to prove the contentions set out in Hutton's third party complaint against Naess are essentially the same as the facts upon which Hutton relies to sustain Hutton's defense to the claims set out in Hopkins' complaint. That is generally true with respect to the facts, although not with respect to the issues presented, since the duties owed to Hopkins by Hutton and by Naess were not the same.[8]

Some 5,000 pages of depositions have already been taken, a thousand or more interrogatories have been asked and answered, some admissions have been made and other requests for admissions are still open. Although the attorneys for Naess have some familiarity with the matter, having been present at the taking of the depositions of Ragnar Naess and Canedy, the great mass of material developed by depositions, interrogatories and other discovery would not be admis-

---

8. Indeed, the fact that many of the allegations upon which Hutton relies to support its third party complaint also support Hutton's defense to Hopkins' claims is an argument against delaying and complicating the case by bringing in Naess as a third party defendant, because, if proved, those allegations may well result in a judgment for the defendant Hutton on the claims set out in Hopkins' complaint.

sible in evidence against Naess unless Naess consents or unless much of the same ground is gone over again, in order to give the attorneys for Naess an opportunity to object. An inordinate amount of time has been spent during the taking of the depositions not only in developing the facts, but also in prolonged reiterations by Hutton's counsel of Hutton's position and innocence, and in repeated wrangling between Hutton's counsel and Hopkins' counsel, instances of which have been brought to the attention of the court. It is apparent that any substantial repetition of past discovery would be unreasonably time consuming, expensive and vexatious to Naess and to the witnesses, as well as to Hopkins and Hutton. The proliferations of issues, discussed in the next paragraphs, would also involve substantial additional expense and delay to Hopkins. These are factors to be considered.[9]

The strongest argument for denying Hutton's motion is that the proposed third party complaint would create such a complex of claims and issues that a jury would have great difficulty in understanding and keeping in mind the several claims and the distinctions between them. Dyke v. Sechrist, D.Md., 21 F.R.D. 240, 243 (1957); American Zinc Co. of Illinois v. H. H. Hall, E.D.Ill., 21 F.R.D. 190 (1957).

For example, the first count of Hopkins' amended complaint is based on an alleged violation of Section 12(2) of the Securities Act of 1933, 15 U.S.C.A. 77l (2), which requires proof, inter alia, that Hutton "offered or sold" the security. The several counts of the proposed third party complaint would require the jury to consider in connection with the First Count of Hopkins' Complaint not only: (First Count of proposed third party complaint) whether Naess, Hopkins' in-

vestment counsel, also "offered or sold" the security within the meaning of Section 12(2); but also (Sixth Count) whether Naess was guilty of deceit; (Seventh Count) whether Naess was negligent and liable for such negligence despite the terms of its contracts with Hopkins; (Eighth Count) whether Naess violated Section 206 of the Investment Advisers Act of 1940, 15 U.S. C.A. 80b–6; and (All Counts) whether Naess breached its relationship of trust and confidence with Hopkins.

The second count of Hopkins' amended complaint is based upon an alleged violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. 78j (b), and a rule adopted pursuant thereto, which requires proof, inter alia, that Hutton acted as a "broker" or "dealer" in the transaction. The several counts of the proposed third party complaint would require the jury to consider in connection therewith not only: (Second Count) whether Naess also acted as a "broker" or "dealer" within the meaning of Section 10(b); but also the questions raised by the Sixth, Seventh and Eighth Counts, discussed above, and the general allegation of breach of a relationship of trust and confidence.

The other counts of Hopkins' amended complaint raise various statutory and common law questions, and in each instance would be similarly complicated by the several counts of the proposed third party complaint. The duties which Naess would have owed to Hopkins under the various relationships alleged in the several counts of the third party complaint differ among themselves, and are different in many instances from the particular duty of Hutton with which they are matched in the curiously worded paragraphs of the third party complaint, of which Paragraph 14 of the First Count, quoted above, is an example.

9. Dyke v. Sechrist, D.Md., 21 F.R.D. 240, 243 (1957); American Zinc Co. of Illinois v. H. H. Hall, E.D.Ill., 21 F.R.D. 190 (1957); Baldwin v. Hartford Accident and Indemnity Co., et al., D.Neb., 14 F.R.D. 504 (1953); Lee's, Inc. v. Transcontinental Underwriters, etc., D.Md., 9 F.R.D. 470 (1949).

The complexity of the points and combinations of points which would result from the proposed third party complaint would almost inevitably lead to confusion in the minds of the jury. Less complex situations have been held to require or justify the denial of leave to file a third party complaint. Dyke v. Sechrist, supra; American Zinc Co. of Illinois v. H. H. Hall, supra; Lee's, Inc. v. Transcontinental Underwriters, etc., D.Md., 9 F.R.D. 470 (1949).

▇ Primarily because of the complication of issues which would result from the filing of the third party complaint, but also because of the delay and expense to Hopkins, the unreasonable expense to Naess, and the laches of Hutton, the Court concludes that leave to file the third party complaint should be denied.[10]

It is so ordered.

## Supplemental Opinion

The question now to be decided is the date on which plaintiff's amended complaint shall be deemed to have been filed.

The original complaint was filed on November 1, 1963. In seven counts it alleged violations of various sections of the Securities Act of 1933 and of the Securities Exchange Act of 1934, negligence and fraud. Defendants answered, and both parties conducted extensive discovery.

On October 29, 1965, counsel for plaintiff served on counsel for defendants and left with the Clerk for presentation to the Court a motion for leave to file an amended complaint, to which were attached the proposed amended complaint, signed by counsel, and a proposed order. The amended complaint increased the ad damnum for "actual" damages and added a claim for punitive damages; otherwise it added little of substance to the original complaint.[1]

This Court does not like to sign ex parte orders, and local counsel for defendants wished to communicate with New York counsel before consenting to the filing of the amended complaint. Such consent was given on November 10, and the Court signed an order on that date granting leave to file the amended complaint, but leaving open, at defendants' request, the question whether it should be deemed to have been filed on October 29 or on November 10. That question has been argued orally and briefed. No case in point has been cited or found.

Rule 15, F.R.Civ.P., provides, inter alia:

"(a) *Amendments.* A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial

---

10. This decision makes it unnecessary to pass on other points raised by Hopkins and Naess, namely:

1. That the sections of the 1933 Act and the 1934 Act referred to in the amended complaint and the proposed third party complaint do not specifically provide a right of contribution, whereas other sections of those acts do so provide. See 15 U.S.C.A. §§ 77k(f), 78i(e) and 78k(b). But see the provisions of the Uniform Contribution Among Tort-Feasors Act, in force in Maryland, Ann. Code of Md., 1957 ed., Art. 50, § 16 et seq.

2. That refusal to dismiss the counts of the proposed third party complaint which are not based upon a federal statute would stretch the doctrine of pendent jurisdiction beyond the breaking point. On the other hand, third party jurisdiction is usually regarded as ancillary. See United Mines Workers of America v. Gibbs, 86 S.Ct. 1130, 1136–1140 (1966).

3. That the several counts of the proposed third party complaint do not state claims upon which relief can be granted.

The Court intimates no opinion upon any of the points referred to in this note.

1. The amended complaint is summarized in an earlier opinion in this case, 40 F. Supp. 338, at 340.

calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. * * *

" * * *

"(c) *Relation Back of Amendments*. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

The question of relation back, covered by paragraph (c), is the more important question in this as in most cases, but it has not yet been briefed or argued, and should not be decided until all facts are developed. The date as of which the amended complaint shall be deemed to have been filed may have some importance on the issue of limitations.

Defendants cite Gaumont v. Warner Bros. Pictures, S.D.N.Y., 2 F.R.D. 45 (1941), where the Court said: "Although amendments are 'freely given when justice so requires' F.R.C.P. 15(a), the rule is specific that leave of the court must be obtained. That has not been sought here and the pleading, therefore, is without legal effect." This Court agrees. But Rule 15(a) does not say "by prior leave of court" or "by leave first had and obtained".

■ Where the proposed amended pleading is filed and served on counsel for the adverse party at the same time as the motion, the amended pleading should be deemed to have been filed on the date on which it and the motion were filed, whether the order is signed at once or delayed in order to give the adverse party time to object. It would not be just to make the date of filing depend upon availability of the judge, possible delays in hearing or ruling on objections to the motion or other matters beyond the control of the moving party.

The amended complaint in this case shall be deemed to have been filed on October 29, 1965.